1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

8   BARBARA WILLIAMS,                    )    No. CV-06-197-LRS
9                                        )
                                         )    **ORDER DENYING**
10                     Plaintiff,        )    **MOTION FOR SUMMARY**
                                         )    **JUDGMENT,** *INTER ALIA*
11          vs.                          )
                                         )
12                                       )
    U.S. BANCORP, a Delaware             )
13  corporation, et al.,                 )
                                         )
14                                       )
                                         )
15                                       )
                     Defendants.         )
16  _____  )

17
18       **BEFORE THE COURT** is Defendant Diebold Incorporated's Motion For
    Summary Judgment (Ct. Rec. 67).  This motion is heard without oral argument.[1]
19
         Also before the court is Plaintiff's Motion To Enlarge/Continue Time To
20
    Respond To Diebold Incorporated's Motion For Summary Judgment (Ct. Rec. 92),
21
    heard without oral argument.
22   ///
23

24   _____

25     [1]  Pursuant to LR 7.1(h)(3), the court exercises its discretion to hear the
    motion without oral argument, notwithstanding Plaintiff's request for oral
26  argument included with her most recent response (Ct. Rec. 95) filed on August 7,
27  2008.
28

**ORDER DENYING MOTION FOR**
**SUMMARY JUDGMENT,** *INTER ALIA* -   **1**

## I. BACKGROUND

On March 21, 2003, Plaintiff traveled to the U.S. Bancorp's branch located in Clarkston, Washington in order to make a deposit. She pulled her vehicle into the outside drive-through lane and used the pneumatic cash transfer system ("U.S. Bank Transfer System"). A component of this system was the 4-inch Mosler AutoBanker. In her "Third Amended Complaint," Plaintiff alleges that as she was attempting to make her deposit, her left hand and/or arm was sucked into and/or caught in the deposit system, resulting in the twisting of her hand, arm and shoulder, and partially dragging her out of her vehicle. Plaintiff alleges she was injured.

The "Third Amended Complaint" alleges that "Diebold breached its duties of care owed to [Plaintiff] when it failed to design, manufacture, maintain, label, and/or install a reasonably safe deposit system" which proximately caused Plaintiff's injuries." (Paragraph 4.3). It is alleged that Diebold's conduct constitutes "negligence under common law and/or RCW 7.72 et seq." It is also alleged that "[a]s the purchaser of Mosler, Inc.'s assets and/or the manufacturer of the deposit system, Diebold is strictly liable for [Plaintiff's] damages under RCW 7.72.030." In the alternative, it is alleged that "if Diebold is not the manufacturer of the deposit system and did not purchase the liability for the deposit system when it purchased certain assets pertaining to the deposit system from Mosler, Inc., Diebold is liable for [Plaintiff's] damages as it is required to stand in the shoes of the manufacturer under RCW 7.72.040." (Paragraph 4.5).

Diebold now moves for summary judgment on all claims asserted against it. Diebold acknowledges that prior and subsequent to March 21, 2003, it provided

///
///
///
///
///

**ORDER DENYING MOTION FOR
SUMMARY JUDGMENT, *INTER ALIA*-    2**

repair services for the 4-inch Mosler AutoBanker at issue[2], but asserts there is no evidence creating a genuine issue of material fact that any repairs it performed proximately caused Plaintiff's injuries.    Defendant further contends there is no genuine issue of material fact that it did not  manufacture and/or sell the 4-inch Mosler AutoBanker, and furthermore, as a matter of law, it cannot be held liable as a "successor" to Mosler, Inc.

## II.  DISCUSSION

### A.  Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court.  *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975).  Under Fed. R. Civ. P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th Cir. 1985).  Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.

The moving party has the initial burden to prove that no genuine issue of material fact exists.  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986).  Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.*  The party opposing summary

---

[2]  At Paragraph 3 of his declaration (Ct. Rec. 71), Ron Roberson, Service Technician for Diebold, states: "Prior and subsequent to the date of the incident at issue in the lawsuit . . . March 21, 2003, I serviced the security products at the U.S. Bank location in Clarkston, Washington including the pneumatic cash transfer system at the outside lane."

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA-*    **3**

judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex*, 477 U.S. at 322-23.

## B. Liability Under The WPLA As "Manufacturer" And/Or "Product Seller" Of 4-Inch Mosler AutoBanker

RCW Chapter RCW 7.72 contains the Washington Products Liability Act (WPLA).

RCW 7.72.030 pertains to the liability of a manufacturer of a product. A product manufacturer is subject to liability if a claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided. RCW 7.72.030(1). A product manufacturer is subject to strict liability if the claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction or not reasonably safe because it did not conform to the manufacturer's express warranty or to the implied warranties under Title 62A RCW. RCW 7.72.030(2).

A product seller, other than a manufacturer, is liable if the claimant's harm was caused by the negligence of such product seller. RCW 7.72.040.

There is no dispute that Mosler manufactured the 4-inch Mosler AutoBanker in question, not Diebold, and that Mosler designed and constructed the same. (Diebold's Statement of Fact No. 31 at Ct. Rec. 69). Plaintiff's Statement of Facts

**ORDER DENYING MOTION FOR
SUMMARY JUDGMENT, *INTER ALIA*- 4**

(Ct. Rec. 96) does not respond to Diebold's Statement of Fact No. 31.

Plaintiff, however, apparently argues that Diebold qualifies as a "product seller" under the WPLA in its own capacity (not as a successor to Mosler). In his Declaration in support of Diebold's motion for summary judgment (Ct. Rec. 73 at Paragraph 9), Mark Tucker, Corporate Risk Manager for Diebold, states: "As part of the Asset Purchase Agreement, Diebold did not purchase from Mosler any inventory of the 4-inch Mosler AutoBanker pneumatic cash transfer system." In his subsequent deposition taken on July 16, 2008, however, he acknowledged that he did not have personal knowledge of this "fact." (Ex. I to Supplemental Declaration of Roderick C. Bond , Ct. Rec. 98, pp. 14-15). He testified that Mosler AutoBankers may have been acquired by Diebold when Diebold purchased assets from the Mosler bankruptcy estate. (*Id*. at p. 40).

Plaintiff notes that certain archived pages of the Mosler website from January and September 2002 refer to Mosler as "A Division Of Diebold" and state that "[o]n October 26, 2001, Diebold purchased certain physical and electronic security assets of Mosler, along with other service and support activities and related properties." On these webpages, various Mosler products were advertised, including the AutoBanker systems (including the "AutoBanker III Upsend Drive-In System," and the "AutoBanker RT Drive-in Banking System"). (Exs. B, C, D, E and F to Supplemental Declaration of Roderick C. Bond at Ct. Rec. 98).[3] Diebold says the Mosler website is irrelevant and that Plaintiff baselessly assumes these webpages are advertising Mosler products for sale that Diebold produced. According to Diebold, it left the Mosler website active for "a limited period" after the asset purchase in order to assist customers who already had the Mosler products in place. Diebold asserts the Mosler website did not advertise that the Mosler products were being sold by Diebold. Instead, Diebold says it was merely promoting repair service and customer service for

---

[3] It is unclear if either one of these systems represents the actual 4-inch Mosler AutoBanker that was involved in the incident.

**ORDER DENYING MOTION FOR**
**SUMMARY JUDGMENT, *INTER ALIA*- 5**

Mosler products.

Plaintiff apparently argues that a reasonable inference arises from this evidence that after Diebold acquired Mosler assets, possibly including 4-inch AutoBankers, it sold some of those machines. There is no evidence in the record establishing the precise date that U.S. Bancorp acquired the particular 4-inch Mosler AutoBanker that allegedly caused Plaintiff's injury. Furthermore and significantly, however, Plaintiff does not dispute Diebold's Statement of Fact No. 34 (at Ct. Rec. 69) that "Diebold did not sell or install the specific 4-inch Mosler Autobanker involved in this incident." (See Plaintiff's Statement Of Facts In Opposition To Diebold's Motion For Summary Judgment at Ct. Rec. 96). As such, the court fails to see how Diebold could be held liable as a "product seller" **in its own capacity**. If Diebold did not sell the particular machine that caused the injury, it could not have "proximately caused" the Plaintiff's injury. Thus, the only way that Diebold could be liable as a "product seller" (or "manufacturer" for that matter) is as **a successor** to Mosler, discussed *infra*.

## C. Successor Liability Under The WPLA (As "Manufacturer" And/Or "Product Seller")

Diebold says the court should find as a matter of law there is no successor liability because: (1) an order of the U.S. Bankruptcy Court for the District of Delaware stated that Diebold had "no liability or responsibility for any liability or other obligation of [Mosler] arising under or related to the Purchased Assets other than as expressly set forth in the Asset Purchase Agreement;" and 2) Washington law would not impose successor liability.[4]

### 1. Delaware Bankruptcy Court Order

---

[4] This is a diversity case and therefore, Washington substantive law applies.

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 6**

On October 25, 2001, the U.S. Bankruptcy Court for the District of Delaware in the Chapter 11 proceedings re Mosler, Inc., issued an order authorizing sale of assets. (Ct. Rec. 278 in Case No. 01-10005).[5] This order, at Paragraph 31, contains the language quoted above, as well as additional language that "[n]either the Purchaser [Diebold] nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets, to: (a) be a successor to the Debtors [Mosler]; (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors." Paragraph 31 concludes with the following language: "Neither the Purchaser nor its affiliates, successors or assigns is acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the Asset Purchase Agreement and this Order."[6]

Diebold cites no case law indicating that this type of order pertains to any claims other than those **existing** at the time the order was entered and which had the potential to affect the bankruptcy estate. Diebold merely cites the language of the order and conclusorily asserts that it precludes successor liability for any claims, even those arising long after the bankruptcy order was entered. The case law the court has found indicates the successor liability which is precluded by the terms of a bankruptcy order pertains to an **existing** liability. In *In re White Motor Credit Corp.*,

---

[5] The order contains the wrong case number (00-10055). The court takes judicial notice of the document, thus rendering moot Plaintiff's objection that the copy supplied by Diebold is unauthenticated, not certified, and should not be considered. The court has independently verified the existence of the order by looking it up on the electronic filing system of the Delaware Bankruptcy Court.

[6] The Asset and Purchase Agreement is dated October 17, 2001 and called for a closing date of October 24, 2001, or on such other date as would be mutually agreeable by the parties. (Ct. Rec. 315 in Del. BK No. 01-10055). Plaintiff has provided a copy of the main page from Mosler's website dated January 19, 2002 which states the sale took place on October 26, 2001.

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    7**

75 B.R. 944 (N.D. Ohio 1987), the court there was asked to decide the issue of whether state successor liability law is preempted by federal law to the extent that claims underlying the successor's liability have been discharged under a plan of reorganization.  The court held in the affirmative:

> The federal purpose of final resolution and discharge of corporate debt is clearly compromised by imposing successor liability on purchasers of assets when the underlying liability has been discharged under a plan of reorganization.

*Id*. at 950.  According to the court:

> The effects of successor liability in the context of a corporate reorganization preclude its imposition.  The successor liability specter would chill and deleteriously affect sales of corporate assets, forcing debtors to accept less on sales to compensate for this potential liability.  This negative effect on sales would only benefit product liability claimants, thereby subverting specific statutory priorities established by the Bankruptcy Code.

*Id*. at 951.

Based on its review of the docket for the Chapter 11 bankruptcy filed by Mosler, this court notes that following the sale of substantially all of its assets, Mosler changed its name to MDIP, Inc.  On June 26, 2003, the bankruptcy court entered an order confirming MDIP, Inc.'s Chapter 11 Plan.  (Ct. Rec. 961 in Del. BK Case No. 01-10055).  A confirmation of a plan "discharges a debtor from any debt that arose before the date of such confirmation," although such confirmation does not discharge a debtor if the plan provides for liquidation of substantially all of the property of the estate and the debtor does not engage in business after consummation of the plan.  11 U.S.C. Section 1141(d)(1)(A) and (3).  Thus, a corporation that does not continue in business after plan confirmation does not receive a discharge.  *In re Wolverine Radio, Inc.*, 930 F.2d 1131, 1147 n. 21 (6th Cir. 1991).

It appears Mosler did not continue in business after plan confirmation. Although Plaintiff's (Williams') cause of action arose in March of 2003, before confirmation of the plan, it was not asserted as a "claim" against anyone until after the Chapter 11 plan was confirmed in June 2003.  Diebold was not made a Defendant

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    8**

in the case at bar until March 2007, and the Litigation Trust of MDIP, Inc. was not made a Defendant until October 2007.[7]    Unlike the pre-confirmation claim at issue in *White* as to which the court found there could be no successor liability, Plaintiff's claim is a post-confirmation claim.  The reasons for precluding successor liability for pre-confirmation claims do not apply to post-confirmation claims.  By the time Plaintiff asserted her claim against Diebold in 2007, the sale of assets from Mosler to Diebold had long been consummated and Mosler clearly was not "forced to accept less" on the sale because of Plaintiff's claim.  This is because at the time of the sale in October 2001, there was no "potential liability" to Plaintiff because the incident in question had not even occurred.  Plaintiff's claim could not affect the amount of assets available to the bankruptcy estate.

The case at bar should be compared with  *Myers v. U.S.*, 297 B.R.774 (S.D. Cal. 2003), in which the court cited *White* with approval and found plaintiff's successor liability claims under California state law were preempted because plaintiff knew of the bankruptcy action and asked to participate therein.  According to the *Myers* court:

> In Chapter 11 proceedings, the court is trying to obtain and preserve as many assets as it can to protect secured and un- secured creditors.  To do so, it needs to approve sales of assets to third parties.  A key factor to a third party in purchasing assets is the 'worth' of the asset.  Third parties cannot assess 'worth' if the Bankruptcy Court orders that they take assets free and clear of any and all claims whatsoever, but none-

---

[7]  Plaintiff's "Third Amended Complaint" alleges that the Litigation Trust of MDIP, Inc., is a trust created from certain portions of assets and/or liabilities of the Mosler bankruptcy estate, which may include assets and/or liabilities related to the deposit system.  (Paragraph 1.4).

The "Third Amended Complaint" also alleges that ProxyMed, Inc., is a Florida corporation who acquired certain assets and/or liabilities from MDIP, some of which may include liability or insurance policies relating to this action. (Paragraph 1.5).

Although named as Defendants, apparently neither of these entities have been served with the "Third Amended Complaint."

**ORDER DENYING MOTION FOR**
**SUMMARY JUDGMENT,** *INTER ALIA-*    **9**

theless, unsecured creditors 'lie in the weeds' and wait until the bankruptcy court approves a sale before it sues the purchasers.

*Id.* at 784.

Based on *White*, and especially because Diebold has not provided any case law or reasoning why the October 2001 order of the Delaware Bankruptcy Court should bar successor liability as to a claim that did not exist in October 2001, or before confirmation of the Chapter 11 plan in June 2003, this court finds the October 2001 bankruptcy court order does not preempt application of Washington state successor liability law to determine if Diebold, as a successor to Mosler, is potentially liable to Plaintiff under the WPLA.

### 2. Washington State Successor Liability Law

Under traditional corporate successor rules, a corporation purchasing the assets of another corporation does not by virtue of that purchase become liable for the debts of the selling corporation. *George v. Parke-Davis*, 107 Wn.2d 584, 588, 733 P.2d 507 (1987). There is, however, a "product line" exception to this traditional rule of nonliability of the successor corporation. This exception requires three factors to be established in order to find liability. First, the transferee must acquire substantially all of the transferor's assets, leaving no more than a corporate shell remaining. Secondly, the transferee must hold itself out to the public as a continuation of the transferor, and must do so by producing the same product line under a similar name. Thirdly, the transferee corporation must benefit from the goodwill of the transferor. *Id*.

Production of essentially the same product line is necessary in order to establish liability because the transferee corporation has "the knowledge necessary for gauging the risks of injury from previously manufactured [units] together with the opportunity to provide for meeting the cost arising from those risks by spreading it among current purchasers of the product line . . . ." *Id*. at 589, quoting *Martin v.*

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 10**

1   *Abbott Labs.*, 102 Wn.2d 581, 614, 689 P.2d 368 (1984).  The rationale for the

2   product-line exception is threefold:  1) the plaintiff would have no other recovery

3   than that against the successor corporation; 2) the successor corporation has a greater

4   ability to spread the risk among future consumers of the same product; and 3) the

5   successor corporation benefits from the assumption of the old corporation's goodwill

6   and thus, should shoulder the burdens associated with those products. *Id*. at 589-90.

7   Liability is only premised on that part of the goodwill associated with the injurious

8   product. *Id*. at 590.[8]

9

10      **a. Acquisition of "Substantially All" Assets**

11      The October 2001 "Asset Purchase Agreement" between Mosler and Diebold

12   repeatedly refers to Mosler transferring "substantially all" of its assets to Diebold.[9]

13   Paragraph 1.1 lists all of the "Purchased Assets," while Paragraph 1.2 lists the

14   "Excluded Assets."

15      Diebold's response is that Mosler was not rendered a "mere" corporate shell

16   because by retaining its cash, insurance policies, and claims against third parties, it

17   had the capacity to conduct "remaining business."  First, it is noted that the claims

18   Mosler retained against third parties were only those claims relating to "excluded

19   ──────────────

20      [8] Contrary to Diebold's assertion, *George v. Parke-Davis* is not inconsistent

21   with *Hall v. Armstrong Cork, Inc.*, 103 Wn. 2d 258, 267, 692 P.2d 787 (1984),

22   which stated "[t]he goodwill transfer contemplated by the product line rule is that

23   associated with the predecessor business entity, not that associated with individual

24   products."  *George* also says the goodwill must be associated with the predecessor

     business entity, but that liability is premised only on the **part** of that goodwill

     from the business entity that is associated with the injurious product.

25      [9] Plaintiff objects to the unsigned version of the Asset Purchase Agreement

26   appended to the Declaration of Mark Tucker.  The court, however, has

27   independently confirmed this is the same agreement that was filed with the

     Delaware Bankruptcy Court on October 25, 2001.

28   **ORDER DENYING MOTION FOR**
     **SUMMARY JUDGMENT,** *INTER ALIA*-    **11**

assets" and "excluded liabilities." Furthermore, the assets purchased by Diebold from Mosler is a lengthy one and includes such significant items as all patents, all inventories, all business records, all equipment, all trade accounts receivable, all of Mosler's interests in contracts for the sale of goods and services, etc. Clearly, Mosler was left in no position to continue to conduct business as it once had and its "remaining business" was likely nothing more than winding up of its affairs. There is at least a genuine issue of material fact whether this factor (acquisition of "substantially all" assets) has been met in this case.

In its most recent reply brief filed August 14 (Ct. Rec. 102), Diebold says policy considerations dictate that there be no successor liability because "Plaintiff may have a remedy against Mosler through the litigation trust of MDIP, Inc.," and furthermore, there is no causal connection between Diebold's purchase of Mosler's assets and Mosler's potential unavailability because Mosler was already being liquidated by the bankruptcy court when Diebold purchased "some" of the assets. The Asset Purchase Agreement indicates Diebold did not merely purchase "some" of the assets. Rather, it purchased "substantially all" of them and very significant assets at that. Apparently realizing as much, Diebold resorts to certain policy arguments against exposing it to potential successor liability. These are addressed *infra*.

### b.  Holding Self Out To Public As A Continuation Of The Transferor

Plaintiff notes that certain archived pages of the Mosler website from January and September 2002 refer to Mosler as "A Division Of Diebold" and state that "[o]n October 26, 2001, Diebold purchased certain physical and electronic security assets of Mosler, along with other service and support activities and related properties." On these webpages, various Mosler products were advertised, including the AutoBanker systems. (Exs. B, C, D, E and F to Supplemental Declaration of Roderick C. Bond at Ct. Rec. 98).

Plaintiff notes that following the sale of Mosler assets to Diebold, Diebold

**ORDER DENYING MOTION FOR
SUMMARY JUDGMENT, *INTER ALIA*-    12**

began offering a VAT 24 Auto Banker which it advertised as representing "an upgraded revision of Mosler's AutoBanker RT Downsend remote banking system for replacement opportunities with existing 4" or 4.5" underground tube systems." (Ex. H to Supplemental Declaration of Roderick C. Bond, Ct. Rec. 98).

Diebold contends it did not produce the same product line because the VAT 24 was not manufactured until April 2003, a year and a half after the Asset Purchase Agreement was entered into by Mosler and Diebold. Diebold asserts that "[n]o advertisement or website from this time identifies Mosler as a continuation (or division) of Diebold." The court assumes this is a reference to Diebold advertisements and the Diebold website because Plaintiff has produced pages from the Mosler website which clearly hold Mosler out as a "Division Of Diebold." As noted above, Diebold says the Mosler website is irrelevant and that Plaintiff baselessly assumes these webpages are advertising Mosler products for sale that Diebold produced. According to Diebold, it left the Mosler website active for "a limited period" after the asset purchase in order to assist customers who already had the Mosler products in place. Diebold asserts the Mosler website did not advertise that the Mosler products were being sold by Diebold. Instead, Diebold says it was merely promoting repair service and customer service for Mosler products.

Based on the Mosler webpages which appeared subsequent to Diebold's acquisition of Mosler assets, possibly including 4-inch AutoBankers, a reasonable inference arises that Diebold sold these 4-inch AutoBankers, even if it did not sell the particular machine alleged to have caused Plaintiff's injuries. In addition, or alternatively thereto, a reasonable inference arises that the VAT 24 was a continuation of the 4-inch Mosler AutoBanker under a similar name ("VAT 24 **Auto Banker** Downsend System"). Although Diebold maintains the VAT 24 was a continuation of Diebold's own product line, it acknowledges it was "similar in part" to the 4 inch Mosler Autobanker. (Declaration of Mark Tucker, Ct. Rec. 73, at Paragraph 15: "This new system was similar in part to the 4-inch Mosler Autobanker

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 13**

pneumatic cash transfer system design"). The court concludes there is a genuine issue of material fact whether Diebold held itself out to the public as a continuation of Mosler by selling the same product (the 4-inch Mosler AutoBanker) or the "same type of product" (the Diebold VAT 24).[10]

### c. Benefitting From Goodwill Of Transferor

Considering that after Diebold purchased "substantially all" of the assets of Mosler, the Mosler website advertised Mosler as a "Division of Diebold," and that Diebold advertised its VAT 24 Auto Banker as an "upgraded revision of Mosler's AutoBanker RT Downsend remote banking system," there is also a genuine issue of material fact whether this factor is met. Furthermore, the court notes that Plaintiff has offered evidence (Ex. G to Supplemental Declaration of Roderick C. Bond) that in 2002, after it purchased the Mosler assets, Diebold sought to trademark the "AUTOBANKER" name.[11]

### 3. Conclusion

On summary judgment, "[a]ll reasonable inferences must be resolved against the movant and considered in the light most favorable to the nonmoving party." *Martin v. Abbott Labs.*, 102 Wn.2d at 616. In *Martin*, the Washington Supreme Court reversed a lower court's grant of summary judgment which found as a matter of law

---

[10] Diebold contends the VAT 24 is not the "same type of product" because it was merely intended to be compatible with the existing tubing infrastructure for the 4-inch Mosler AutoBanker. A jury should make that assessment. It is noted that in his deposition, Mark Tucker indicated that tubing would have been purchased from Mosler as well. (Tucker Depo. at p. 10, Ex. I to Ct. Rec. 98)

[11] At his deposition, Mark Tucker testified he did not know if Diebold had used the "AutoBanker" name before it purchased assets from Mosler. (Tucker Depo. at p. 11, Ex. I to Ct. Rec. 98).

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA*- **14**

there was no successor liability.  As in *Martin*, there is evidence in the case at bar that Diebold purchased substantially all of the assets of Mosler.  There are also issues of fact concerning Diebold's continuation of the 4-inch Mosler AutoBanker, whether as the Mosler AutoBanker itself, or the Diebold VAT 24, and in turn, Diebold's assumption of Mosler's goodwill associated with the 4-inch Mosler AutoBanker.  *Id*. at 616-17.

It follows that the policy rationale behind the "product-line exception" to products liability is implicated here because there is a genuine issue of material fact whether Diebold's acquisition of assets from Mosler has left the Plaintiff without a remedy against Mosler.  *Hall v. Armstrong Cork, Inc.*, 103 Wn.2d 258, 264, 692 P.2d 787 (1984)(exception was developed to balance the concerns presented by a situation where an injured plaintiff is left without a meaningful remedy with the concerns regarding the "elemental fairness demands that there be a causal connection between the successor's acquisition and the unavailability of the predecessor").  Diebold suggests Plaintiff "may" have a remedy against the MDIP, Inc. litigation trust.  This, however, amounts to nothing more than speculation at this point.

### D.  Common Law Negligence (Diebold As Repairer/Maintainer Of Transfer System)

Plaintiff's common law negligence claims are not preempted by the WPLA because they are not product-liability claims which are dependent on Diebold's status as a "manufacturer" and/or "product seller" (or as a successor to the "manufacturer" and/or "product seller").  Instead, they are distinct negligence claims focusing on Diebold's independent responsibility for repair/maintenance of the product.  See *Bostwick v. Ballard Marine, Inc.*, 127 Wn.App. 762, 773, 112 P.3d 571 (2005)("Nothing in WPLA relieves one who is not a product seller from liability for negligence").

///

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    15**

### 1. Negligent Repair

This claim is adequately pled in Plaintiff's "Third Amended Complaint." Paragraph 4.2 alleges Diebold owed Plaintiff a duty of care to "maintain" a reasonably safe deposit system.  As noted above, Diebold acknowledges that it serviced the particular machine involved in the incident, both before and after the incident on March 21, 2003.

Plaintiff has presented no evidence that anything that Diebold specifically did prior to March 21, 2003, somehow made the machine unsafe or "unsafer," and proximately caused Plaintiff's injuries.  Plaintiff's assertion appears to be, however, that Diebold was negligent in failing to undertake repairs to make the machine safer when it knew or reasonably should have known at the time that the machine was unsafe because of certain alleged design defects.

Considering the design defects of the Mosler 4-inch AutoBanker alleged by Plaintiff's expert, Richard Gill, Ph.D., in his report (Ex. B to Ct. Rec. 81 as authenticated by his Declaration at Ct. Rec. 97), it is not apparent that there were any "repairs" Diebold could have taken to make the machine safer.  Gill's report suggests the only solution was replacement of the machine with a better designed and safer machine, or at least providing warnings about the danger of the existing machine. (See discussion *infra* re independent duty of successor to warn about hazards of a product).  In his report, Gill states there were variety of potential mechanisms by which Plaintiff could have become "entrapped," including "failure of the presence sensor mechanism, low pressure suction into the inlet tube, and entanglement in the cradle and its associated infrastructure."  Gill asserts the design of the cradle was contrary to general design constraints to prevent inadvertent entanglement; that the design failed to provide any type of guarding to protect users from inadvertent entanglement and/or entrapment; a "Caution" sign was found only on the inside of the carrier and provided information relative only to proper operation and functioning of the system and provided no safety or warning information; and the machine was

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 16**

not designed with an emergency stop control at the customer's station, nor was there such a device at the teller's station. Gill says the emergency stop control is particularly important for a machine such as the one involved in this incident where "the user is expected to manually interact with component parts; parts that are design[ed] to move and/or apply forces to objects within the general area where the user is suppose[d] to interact with the equipment and/or place their hands." This seemingly is a reference to the fact that the controls on the 4-inch Mosler AutoBanker are located below the carrier. The Diebold VAT 24 Auto Banker changed this so that the controls (the "call" and "send" buttons) are above the carrier. During his deposition, Mark Tucker acknowledged that this change in the design made the VAT 24 a safer product. (Tucker Depo. at p. 32, Ex. I to Ct. Rec. 98).

In his report, Gill acknowledges the following: "Given the information available to date and the inability to inspect the subject kiosk, it is not possible to conclusively determine whether Ms. Williams' entanglement and/or entrapment was due to a defective design, defective maintenance, and/or defective implementation and/or enforcement of a proper maintenance program."[12]

### 2. Independent Duty To Warn

A corporation's liability under this theory does not stem from its status as a successor, and is independent of claims based on the traditional rule of successor nonliability and its exceptions . A successor corporation may incur liability for injury caused by a defective product manufactured by its predecessor, when there is found to exist a special relationship between the successor corporation and the predecessor's

---

[12] Gill has not been able to examine the "subject kiosk," the 4 inch Mosler AutoBanker, because it was removed and its whereabouts are unknown. See Roberson Declaration (Ct. Rec. 71) at Paragraph 9.

**ORDER DENYING MOTION FOR**
**SUMMARY JUDGMENT, *INTER ALIA*-    17**

customers. *Gee v. Tenneco, Inc.*, 615 F.2d 857, 865-66 (9ᵗʰ Cir. 1980).[13]

It is undisputed that Diebold, after purchasing Mosler's assets, continued to have a relationship with Mosler's customers and indeed, serviced the Mosler machine at issue prior to the incident of March 21, 2003.  At a minimum, there is enough evidence to raise a genuine issue of material fact whether the relationship between Diebold and Mosler's former customers was sufficient to create a duty to warn on the part of Diebold.  "Succession to a predecessor's service contract, coverage of the particular machine under a service contract, service of that machine by the purchaser corporation, a purchaser corporation's knowledge of defects and of the location or owner of that machine, are factors which may be considered in determining the presence of a nexus or relationship effective to create a duty to warn." *Gee*, 615 F.2d at 866, quoting *Travis v. Harris Corp.*, 565 F.2d 443, 449 (7ᵗʰ Cir. 1977).

**E.  Proximate Cause**

Proximate cause is something which Plaintiff needs to establish whether under a negligence theory or a strict liability (product liability) theory.  In other words, if there has been a breach of duty, Plaintiff must prove that breach proximately caused her injuries.

Diebold asserts that Plaintiff cannot establish facts that the 4-inch Mosler

---

[13]  *Gee* was a diversity case out of California where because neither party cited any California law bearing on the precise issue of a successor corporation's duty to warn of defects in products manufactured by a predecessor, the Ninth Circuit deemed it appropriate to examine precedents elsewhere in order to determine whether the district judge accurately approximated California law in concluding there was no duty to warn under the particular circumstances presented in the *Gee* case.  615 F.2d at 866.

Here, there has been no citation to any Washington case discussing a successor's independent duty to warn of a defective product manufactured by a predecessor.  That said, Diebold does not argue that Washington does not or would not subscribe to such a theory.

**ORDER DENYING MOTION FOR**
**SUMMARY JUDGMENT,** *INTER ALIA*-    **18**

AutoBanker was not reasonably safe and that it proximately caused her injuries.[14]
Diebold cites to recent deposition testimony of the Plaintiff in which Plaintiff testified
that her arm was "sucked" into the tube up to the elbow and that she had to pull her
arm and the cannister (the "tube") back out of the machine. (Ex. A to Supplemental
Declaration of Allison Miller at Ct. Rec. 104). Diebold cites deposition testimony of
Plaintiff's expert, Richard Gill, that it would have been physically impossible for the
Plaintiff to have her hand around the cannister and also in the tubing at the same time.

It is apparent from the provided excerpts of Plaintiff's deposition testimony
that she is not entirely certain what exactly happened to her on the date of the
incident.  Moreover, it is possible that although she perceived herself as holding onto
the cannister the entire time, and that her arm was sucked into the machine up to the
elbow, that is not what actually happened.  It may have felt like that to her, but what
may have actually happened is that her arm got sucked in only part way (not up to the
elbow) and/or she did not hold onto the cannister the entire time.  At his deposition,
Gill testified, "[i]t may produce an illusion that that's what happened [sucked arm all
the way up to elbow while still holding the cannister] because you had a hold of it,
you started to insert it into a hole, suddenly it disappears up into the hole and your
hand disappears up into the hole."  According to Gill, however, the "physical reality
is what had to have happened is the cannister got pulled in, it got pulled out of your
hand and the momentum of your hand got pulled up with it along with the tube . . .
[b]ut you couldn't physically have ahold of it at the same time."  (Ex. B to
Supplemental Declaration Of Allison Miller, Ct. Rec. 104, at p. 56)  Gill added that
what can physically happen is that  "a portion of the cannister can go up in and a

---

[14]  In the Defendant's motion filed in May 2008, this was not asserted as a
basis for summary judgment.  Diebold advances the argument for the first time in
it August 14 reply brief based on depositions it conducted on August 4 (Plaintiff)
and August 5 (Gill).  Thus, Plaintiff has not had an opportunity to respond to this
argument.

**ORDER DENYING MOTION FOR
SUMMARY JUDGMENT, *INTER ALIA*-   19**

portion of my fingers can go up in and I still have a hold of it." *Id.*

Diebold contends Plaintiff has presented no evidence of what alleged design defect proximately caused Plaintiff's injuries. It is true that Gill testified that he was unsure of what might have caused Plaintiff's arm to get "entangled" in the machine (hinge on the cannister; wings on either side of the cannister; protruding buttons, etc.). It should be noted, however, that it may not have been a matter of "entanglement," but rather a matter of "entrapment" simply due to the suction power involved. Gill testified in his deposition that he believes "the product should have a safety feature that prohibits the operation of the suction of the vacuum on the transport tube until the cannister is fully at rest in its holder and the hand is removed." He was not certain if the Mosler machine had such a safety feature. (Ex. B to Ct. Rec. 104 at p. 73). As discussed above, Gill's report also mentioned other design issues, including lack of emergency stop buttons and no warning notices.

Plaintiff has provided sufficient evidence raising a genuine issue of material fact that a design defect and/or lack of proper warnings proximately caused her injury, even if at this juncture, Plaintiff cannot isolate a particular defect as being responsible for the incident. A jury should evaluate Plaintiff's credibility and Gill's credibility in deciding if "proximate cause" is established.

## III. CONCLUSION

As a matter of law, Diebold cannot be held liable under the WPLA, in its own capacity, as a manufacturer or seller of the 4-inch Mosler Autobanker involved in the incident in which Plaintiff alleges she was injured. There are, however, genuine issues of material fact which preclude the court from finding as a matter of law that Diebold is not liable under the WPLA as a successor to Mosler. Furthermore, there are genuine issues of material fact regarding whether Diebold is liable under common law negligence theories in its capacity as a repairer/maintainer of the machine in question. Accordingly, Diebold's Motion For Summary Judgment (Ct.

**ORDER DENYING MOTION FOR
SUMMARY JUDGMENT, *INTER ALIA*- 20**

Rec. 67) is **DENIED**.    It is possible that the court's denial of the motion for summary judgment may render moot the Plaintiff's Motion To Enlarge/Continue Time To Respond To Diebold Incorporated's Motion For Summary Judgment (Ct. Rec. 92).  At this juncture, the court **DENIES** that motion (Ct. Rec. 92) **without prejudice** and will allow Plaintiff to re-note it for hearing if necessary, or file a new motion related to any discovery issues which require resolution prior to trial.

  **IT IS SO ORDERED**.  The District Court Executive is directed to enter this order and forward copies to counsel.

  **DATED** this 12th  day of September, 2008.

      ***s/Lonny R. Suko***__

       LONNY R. SUKO
      United States District Judge

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA-*    **21**